# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

PENNY S. AGUILAR,

    Plaintiff,

  v.                                                         Case No. 20-CV-1013-SCD

ANDREW M. SAUL,
**Commissioner of Social Security,**

    Defendant.

## DECISION AND ORDER

Penny S. Aguilar seeks social security disability benefits based on a bad back and knees, which allegedly cause difficulty sitting and standing for long periods of time, as well as mental impairments that allegedly cause concentration issues. Following a hearing, an administrative law judge determined that Aguilar was not disabled because she could still perform her past jobs as an accounting clerk and a payroll clerk. Aguilar now seeks judicial review of that decision, arguing that the ALJ failed to properly evaluate the medical opinion evidence in the record, the severity of and functional limitations stemming from her mental impairments, and her subjective reports of disabling symptoms. I agree that the ALJ committed reversible error in not addressing certain medical opinion evidence contrary to the ALJ's conclusion that Aguilar retained the ability to perform her past jobs. Accordingly, I will reverse the decision denying Aguilar disability benefits and remand the matter for further proceedings

## BACKGROUND

Aguilar filed this action on July 7, 2020, seeking judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for disability

insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. The matter was randomly assigned to me, and all parties subsequently consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 3, 6. It is now fully briefed and ready for disposition. *See* ECF Nos. 17, 24, 27.

I.   **Procedural History**

Aguilar applied for social security disability benefits in September 2018, alleging that she became disabled on October 6, 2017, when she was fifty-six years old. R. 19, 181–82.[1] Aguilar asserted that she was unable to work due to the following medical conditions: patellofemoral pain syndrome and laxity in the right knee, degenerative disc disease of the lumbar spine, post-traumatic stress disorder, depression, anxiety, residuals of left third metatarsal fracture, and pain syndrome in the left knee. R. 203. In her function report, Aguilar stated that her knees and lower back hurt constantly, whether standing or sitting, and that she had trouble being around other people and trusting people due to her PTSD. R. 214. She further stated that she helped take care of her elderly mother, was able to perform her personal care, prepared simple meals, did some house and yard work (like cleaning, laundry, repairs, and mowing), could drive, shopped in stores, was able to manage her own finances, enjoyed painting with beads and making jellies and jams, and socialized with others. R. 215–19. Aguilar reported that her impairments caused difficulties lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, remembering, and concentrating. R. 219. She indicated that she could sit, stand, and walk, respectively, for only thirty minutes each day. R. 221.

---

[1] The transcript is filed on the docket at ECF No. 13-2 to ECF No. 13-25.

Aguilar's application was first reviewed at the state-agency level by the Wisconsin Disability Determination Bureau. *See* R. 75–107. At the initial level of review, William Fowler, MD, the state-agency physician charged with reviewing the medical evidence of record, opined that Aguilar retained the ability to perform sedentary work.[2] R. 85–86. Based on his review of the record, state-agency psychologist Frank Orosz, Ph.D., opined that Aguilar's mental health impairments did not significantly limit her mental ability to do basic work activities. R. 82–83. Dr. Orosz further opined that Aguilar's mental health impairments were not presumptively disabling because she did not have an extreme limitation of one, or a marked limitation of two, of the four areas of mental functioning a person uses in a work setting (known in social security lexicon as the "paragraph B" criteria): understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* Based on those findings, the state agency determined that Aguilar was not disabled and denied her application. *See* R. 67–84.

The Wisconsin Disability Determination Bureau also denied Aguilar's application after she requested reconsideration. *See* R. 91–107. Like the state-agency physician at the initial level of review, the state-agency physician at the reconsideration level, Ricardo Ramirez, MD, opined that Aguilar retained the ability to perform sedentary work. R. 101–04. However, Dr. Ramirez believed that Aguilar also had certain postural and environment limitations, including that she could only occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds; she could engage in frequent balancing; and she

---

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

should avoid even moderate exposure to hazards like machinery and heights.[3] R. 101–04. The state-agency psychologist at the reconsideration level, Stephen Kleinman, MD, agreed with Dr. Orosz's opinion that Aguilar's mental impairments were not severe or presumptively disabling. *See* R. 98–100.

After the Commissioner denied her application at the state-agency level, Aguilar (along with her attorney) appeared via video for a hearing before ALJ Timothy J. Malloy on December 17, 2019, at which Aguilar and a vocational expert testified. *See* R. 39–74. Aguilar testified that she obtained a bachelor's degree from the University of Wisconsin-Green Bay in 2016 and that she also had an associate degree in business and accounting. R. 45–46. As for her work background, she was in the Marine Corps for about fifteen years, achieving the rank of a staff sergeant. R. 49–50. After the Gulf War, she accepted the government's early-separation incentive and left the Marines. *Id.* More recently, Aguilar worked as a financial specialist for the University of Wisconsin System, first at UW-Green Bay and later at UW-Marinette. R. 46–49. She lost that position in 2016 due to downsizing. R. 46–47. Aguilar testified that she last worked for the Crivitz School District, performing accounting work part-time. R. 49. At the time of the hearing, she was supporting herself with pension benefits from the Department of Veterans Affairs and the Wisconsin Retirement Fund. R. 47, 50–51.

Aguilar testified that she could no longer work due to difficulty sitting and standing for prolonged periods of time. R. 52–53. She started using a cane at some point prior to September 2018 and took it with whenever she needed to walk a lot, like grocery shopping.

---

[3] "'Occasionally' means occurring from very little up to one-third of the time." Social Security Ruling 83-10, Policy Interpretation Ruling Titles II and XVI: Determining Capability to Do Other Work—The Medical-Vocational Rules of Appendix 2, 1983 SSR LEXIS 30, at *13 (1983). "'Frequent' means occurring from one-third to two-thirds of the time." *Id.* at *14.

R. 54. She also claimed to use the cane to get around the house she lived in with her mother. *Id.* Aguilar testified that, within the last year, she switched to using a walker, which she got from the VA in Milwaukee. *Id.* She further testified that she was scheduled for fusion surgery on her back a few days after the hearing. R. 53.

Aguilar testified that she also suffered from mental-health issues. *See* R. 55–62. She stated that she had PTSD, was raped while in the Marines, and had been in counseling "for quite a few years." R. 55. According to Aguilar, she had difficulty concentrating, was anxious, and did not have patience with people anymore. R. 56–58. When asked by the ALJ how she was able to complete her degree and work for a number of years with these mental-health issues, Aguilar responded that it took her a long time to obtain her degree—she started attending classes back in 2000—and that she was able to switch up tasks at work just enough to get by. R. 56–57. Aguilar stated that her pain also affected her mental health, making it "hard to keep focused on anything." R. 64.

As for her activities of daily living, Aguilar testified that she lived with her mother on a five-acre property in Crivitz. R. 46, 51. She moved in after her mother suffered a mild heart attack and, while at first she helped take care of her mother—mowing the yard, helping with grocery shopping, and driving her to stores and appointments—as her own physical health has slowly worsened, now she and her mom "take care of each other." R. 51, 62. Aguilar stated that she couldn't mow the yard anymore or sit long enough to go to the movies. R. 51, 60. She further stated that she sometimes sold jelly, jams, jewelry, and paintings at local craft fairs with her sister, though most of those items were "left over from when [she] could stand [for longer periods]." R. 61.

5

The vocational expert testified next. *See* R. 68–71. She first identified Aguilar's two past relevant jobs as an accounting clerk (a skilled job that was performed at the sedentary exertional level) and a payroll clerk (a semi-skilled job that was also performed at the sedentary exertional level). R. 69. According to the vocational expert, a hypothetical person with Aguilar's age, education, and work experience could still perform both those jobs if she were limited to a restricted range of sedentary work. *Id.* Those jobs could not be performed, however, if that person were limited to unskilled work or if that person were limited to frequent sitting, no standing, and only occasional walking with a cane. R. 70–71.

On March 20, 2020, the ALJ issued a written decision determining that Aguilar was not disabled and denying benefits. R. 16–38. The Social Security Administration's Appeals Council subsequently denied Aguilar's request for review, R. 7–12, making the ALJ's decision a final decision of the Commissioner, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016). This action followed.

## II. The ALJ's Decision

To be considered disabled under the Social Security Act, Aguilar had to prove that she was "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The social security regulations set out a five-step sequential evaluation process to determine disability status. *See* 20 C.F.R. § 404.1520(a)–(g). Aguilar had the burden of proof at each of the first four steps; the burden shifted to the Commissioner at the fifth, and final, step. *See Due v. Massanari*, 14 F. App'x 659, 664 (7th Cir. 2001) (citing *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)).

Applying this standard five-step process, the ALJ here concluded that Aguilar was not disabled. *See* R. 19–33. The ALJ determined at step one that Aguilar had not engaged in substantial gainful activity since October 6, 2017, her alleged onset date. R. 22. At step two, the ALJ found that Aguilar had three severe[4] impairments: degenerative disc disease of the lumbar spine, obesity, and osteoarthritis of the bilateral knees. R. 22–24. The ALJ also found that Aguilar's mental impairments of PTSD, anxiety disorder, attention deficit hyperactivity disorder, and depressive disorder were not severe because they did not cause more than minimal limitation in her ability to perform basic mental work activities. R. 22 (citing Exhibits 8F/7; 20F/1; 21F/92). The ALJ reached this finding by considering the paragraph B criteria, determining that Aguilar had no limitation in her ability to understand, remember, or apply information; no limitation in her ability to interact with others; a mild limitation in her ability to concentrate, persist, or maintain pace; and a mild limitation in her ability to adapt or manage herself. R. 22–24. At step three, the ALJ determined that Aguilar's impairments, alone or in combination, did not meet or medically equal the severity of a presumptively disabling impairment. R. 24–25.

The ALJ next assessed Aguilar's residual functional capacity—that is, her maximum capabilities despite her limitations, *see* 20 C.F.R. § 404.1545(a)(1). The ALJ found that Aguilar could perform the full range of sedentary work. R. 25. In assessing this RFC, the ALJ considered the medical evidence, Aguilar's subjective allegations, and the medical opinion evidence and prior administrative medical findings. *See* R. 25–32.

---

[4] An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

The ALJ did not fully credit Aguilar's allegations of disabling symptoms, finding them inconsistent with the objective medical evidence, her treatment history, and her activities of daily living. *See* R. 25–27. The ALJ noted records showing that, as of October 2019, Aguilar had nearly full strength in all extremities. R. 26 (citing Exhibit 31F/8). Also, the ALJ noted that Aguilar reported being "very pleased with the results of her [knee] surgery" and that "treatment notes from after her fusion [surgery] state she was doing well." R. 26 (citing Exhibits 13F/6, 10; 33F/19). The ALJ also listed activities that purportedly were inconsistent with Aguilar's alleged symptoms, including taking care of her dog and her mother, performing her own personal care, managing her own finances, driving distances less than an hour away, going shopping (if she has a shopping cart), preparing her own meals, using a phone, managing her own medication, using a push mower, spending time with family during the holidays, painting, going to the movies and the casino, planning to join a gym, and attending and selling items at craft fairs. R. 22 (citing Exhibits 2F/51; 12F/4–5; 14F/40; 21F/104).

With respect to the opinion evidence, the ALJ first considered the opinions of Dr. Fowler and Dr. Ramirez, the reviewing state-agency medical consultants. *See* R. 29–30 (citing Exhibits 1A; 3A). The ALJ found persuasive Dr. Fowler's and Dr. Ramirez's opinions that Aguilar could perform sedentary work because they supported their opinions "with a detailed review of the record" and because those opinions were "consistent with the evidence received at the hearing level." R. 29–30. As examples, the ALJ described how Dr. Fowler noted Aguilar's inconsistent use of a cane, that Aguilar received great relief from her right knee surgery, and objective findings showing no evidence of instability or tenderness. R. 29–30 (citing Exhibit 1A/7). The ALJ also described how Dr. Ramirez noted x-rays from June 2018 showing early degenerative changes in her bilateral knees. R. 30 (citing Exhibit 3A/13). Also,

the ALJ determined that these opinions were consistent with records showing that, as of October 2019, Aguilar "continued to display nearly full strength in all extremities." R. 30 (citing Exhibit 31F/8).

However, the ALJ did not find persuasive Dr. Ramirez's opinion that Aguilar had certain postural and environmental limitations, as well as limitations pushing or pulling with her right lower extremity. R. 30. According to the ALJ, these additional limitations were "inconsistent with the evidence presented at the hearing level," wherein it was noted that Aguilar had nearly full strength in all extremities and was pleased with the results of her knee surgery. *Id.* (citing Exhibits 31F/8; 13F/6). The ALJ also noted that Aguilar felt well enough to pull some garbage into a burn pile six weeks after surgery and that, while records showed that she had overdone it that day, "neither she nor her doctor were concerned." R. 30 (citing Exhibit 13F/10).

The ALJ next considered the opinions of Dr. Orosz and Dr. Kleinman, the reviewing state-agency psychological consultants who opined that Aguilar's mental impairments were not severe or presumptively disabling. *See* R. 30–31 (citing Exhibits 1A; 3A). The ALJ found persuasive the psychologists' opinions that Aguilar had only a mild limitation in her ability to maintain concentration, persist, or pace and to adapt or manage herself. According to the ALJ, the psychologists supported these opinions "with a detailed review of the record," and these opinions were "consistent with the evidence received at the hearing level." R. 30. For example, the ALJ described how the psychologists noted that Aguilar "was able to do light activities around the yard and house, as well as work on hand crafts and make jewelry." *Id.* (citing Exhibits 1A/9; 3A/9). The ALJ also noted that the psychologists' opinions concerning Aguilar's ability to maintain concentration, persistence, or pace was "consistent with records

9

showing [Aguilar's] concentration and attention were within normal limits." R. 30 (citing Exhibit 11F/97, 116, 119, 126).

However, the ALJ did not find persuasive Dr. Orosz's and Dr. Kleinman's opinions that Aguilar had a mild limitation in her ability to understand, remembering, or apply information and to interact with others. R. 30–31 (citing Exhibits 1A/9; 3A/9). According to the ALJ, the opinions concerning understanding, remembering, or applying information were inconsistent with records showing that Aguilar's memory was "within normal limits." R. 31 (citing Exhibit 11F/97, 116, 119, 126). Similarly, in the ALJ's view, the opinions concerning interacting with others were inconsistent with evidence presented at the hearing level showing that Aguilar reported less irritability and anxiety with medication and that Aguilar was looking forward to the holidays and socializing with others. R. 31 (citing Exhibit 14F/43, 71).

Next, the ALJ considered the findings of a November 2019 functional capacity evaluation performed by Leigh Brooks, an occupational therapist. *See* R. 31 (citing Exhibit 29F). Based on the results of the evaluation, Brooks opined that Aguilar was capable of sedentary work. R. 2030–31. Specifically, Brooks indicated that Aguilar could occasionally lift thirteen pounds from floor to waist level, occasionally lift three pounds from waist to eye level, occasionally push seventeen pounds, occasionally pull fifteen pounds, frequently sit, never stand,[5] and occasionally walk using an assistive device. R. 2037. (Brooks noted that Aguilar used a four-wheeled walker during testing.) Brooks also noted several non-exertional limitations, including that Aguilar could never climb stairs or engage in repetitive squatting

---

[5] The evaluation noted that "[a] never score for standing does not mean that the client literally can never stand." R. 2037. Rather, it means that, while the client "may be able to stand for brief periods," she "is not able to sustain this for up to 1/3 of the day as required for the 'Occasional' category." *Id.*

and that Aguilar was unable to crawl, climb a ladder, or work kneeling, squatting, or crouching. *Id.*

The ALJ found only some of the functional capacity evaluation findings persuasive. According to the ALJ, Brooks' opinions concerning lifting and sedentary work were persuasive because they were "supported with [Aguilar's] performance during the evaluation," and they were "consistent with the record as a whole." R. 31. The ALJ again noted records from around the time of the evaluation showing that Aguilar "continued to display nearly full strength in all extremities." *Id.* (citing Exhibit 31F/8). However, in the ALJ's view, the remainder of the evaluation's findings were not persuasive. R. 31. The ALJ provided two specific examples. First, the ALJ noted that Brooks' opinion that Aguilar could never climb stairs was "inconsistent with notes from the evaluation stating she was able to climb thirty-two of one hundred steps." *Id.* (Exhibit 29F/10). Second, the ALJ noted that Brooks' opinion that Aguilar could only occasionally walk using an assistive device was "inconsistent with the lack of a prescription for said assistive device." R. 31.

The ALJ also considered the opinions of Peter Fischer, MD, Aguilar's treating psychiatrist. *See* R. 31–32. The ALJ found persuasive Dr. Fischer's opinion that Aguilar had, at worst, mild limitations in her ability to adapt or manage herself. R. 31 (citing Exhibit 32F/5). According to the ALJ, this opinion was "consistent with the record as a whole, which shows [Aguilar] is able to engage in a full range of activities of daily living." R. 31 (citing Exhibit 12F/4–5). However, the ALJ found unpersuasive Dr. Fischer's opinions that Aguilar had moderate limitations in her ability to understand, remember, or apply information; interact with others; and maintain concentration, persistence, or pace, as well as his opinion that Aguilar would be absent from work more than four days per month due to overwhelming

11

anxiety. R. 31 (citing Exhibit 32F/5, 6). The ALJ noted that Dr. Fischer failed to "include objective findings to support his opinions." R. 31. Also, according to the ALJ, these opinions were "inconsistent with the record as a whole," which showed that Aguilar's memory, concentration, and attention were "within normal limits" and that Aguilar "was pleasant and cooperative with euthymic mood and appropriate affect." *Id.* (citing Exhibits 11F/97, 116, 119, 126; 2F/45; 14F/21, 40, 43).

Finally, the ALJ considered the opinions of Judith Bjork, a nurse practitioner who examined Aguilar in connection with her VA pension benefits. *See* R. 32. Nurse Bjork completed a disability benefits questionnaire in September 2018 in which she opined that Aguilar is limited in prolonged sitting, standing, and driving; repetitive tasks such as twisting, bending, lifting, pulling, and pushing; and stair climbing, kneeling, and squatting. R. 915–16. Nurse Bjork further opined that Aguilar's cyclobenzaprine medication may affect her ability to concentrate and operate equipment. R. 916. The ALJ found these opinions unpersuasive because Nurse Bjork "did not include objective findings to support her opinions"; "they were rendered prior to [Aguilar's] right knee and back surgery"; and they were "inconsistent with evidence from after those surgeries." R. 32. For example, the ALJ noted records after Aguilar's knee surgery showing "that she was doing better with great reduction in pain" and treatment notes after her back surgery stating that "she was doing well." *Id.* (citing Exhibits 13F/6; 33F/19).

Continuing the sequential evaluation process, the ALJ determined at step four that Aguilar was able to perform her past relevant work as an accounting clerk and a payroll clerk. R. 32–33. Based on those findings, the ALJ determined that Aguilar had not been under a disability from her alleged onset date through the date of the decision. R. 33.

# APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings."

*Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Although Aguilar contends that the ALJ committed several errors in his decision, I will address only one of those alleged errors because it is significant enough by itself to require remand. Aguilar argues that the ALJ failed to address a medical opinion provided by Jo Ellen Zahn, a nurse practitioner who, like Nurse Bjork, examined Aguilar in connection with her VA pension benefits. *See* ECF No. 17 at 10–11. Following one such exam in September 2019, Nurse Zahn opined that Aguilar "would have a hard time with prolonged sitting, standing, walking, laying down and climbing stairs" as a result of degenerative disc and joint disease in her lumbosacral spine. R. 1967–76. The ALJ described some of the physical exam findings

14

contained in Nurse Zahn's report, *see* R. 27–28 (citing Exhibit 28F/26–27), but he never discussed Nurse Zahn's conclusions about the functional impact of Aguilar's back impairment, *see generally* R. 19–33.

The Commissioner concedes that the ALJ failed to evaluate Nurse Zahn's opinion but argues that this mistake was "no more than harmless error." ECF No. 24 at 22–23. The Seventh Circuit has repeatedly held that administrative error like the one here is subject to harmless-error review and that remand is not required if the reviewing court "can predict with great confidence that the result on remand would be the same." *Schomas v. Colvin*, 732 F.3d 702, 707–08 (7th Cir. 2013) (citing *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011); *Parker v. Astrue*, 597 F.3d 920, 924 (7th Cir. 2010); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010); *Keys*, 347 F.3d at 994–95). "[T]he harmless error standard is not . . . an exercise in rationalizing the ALJ's decision and substituting [the reviewing court's] own hypothetical explanations for the ALJ's inadequate articulation." *McKinzey*, 641 F.3d at 892. Rather, the question for a reviewing court "is now prospective—can [I] say with great confidence what the ALJ would do on remand—rather than retrospective." *Id.*

Based on my review of the record, I cannot say with great confidence that the ALJ would reach the same result on remand. As the ALJ acknowledged in his decision, Aguilar frequently complained that she had difficulty sitting and standing for long periods of time. *See* R. 26–27. Indeed, at the administrative hearing, Aguilar claimed that was *the* reason she could no longer work. R. 52–53. Treatment records show that at times Aguilar walked with a slow and antalgic gait, had severely limited range of motion, and used a cane or a walker to get around. *See, e.g.*, R. 1534, 1654, 2078, 2101. An MRI of Aguilar's lumbar spine from March 2019—which was not produced in time for review by the state-agency physicians—revealed

15

advanced degenerative change with grade I anterolisthesis, moderate central spinal stenosis, and moderate left foraminal narrowing at L4-5, as well as advanced degenerative facet disease and moderate right foraminal narrowing at L5-S1. R. 1026–27. A follow-up MRI from September 2019 revealed similar findings. *See* R. 1916–17. On December 19, 2019—two days after the administrative hearing—Aguilar underwent a laminectomy with fusion. *See* R. 2095–2113. She was discharged from the hospital a few days later "in satisfactory condition," R. 2111, but the record does not contain any other evidence of her condition post-surgery. Nurse Zahn's exam and corresponding opinion therefore appear to corroborate Aguilar's complaints of debilitating back pain and to be consistent with the objective evidence, including Aguilar's recent back surgery.

The Commissioner nevertheless argues that the ALJ's failure to address Nurse Zahn's opinion was harmless for two reasons, but neither one is persuasive. First, in the Commissioner's eyes, "Nurse Zahn's vague opinion that [Aguilar] 'would have a hard time with' certain 'prolonged' activities is of very limited evidentiary value and not necessarily in conflict with the RFC assessment." ECF No. 24 at 23. I disagree. The ALJ found that Aguilar was capable of the full range of sedentary work. R. 25. That RFC assessment is clearly contrary to Nurse Zahn's opinion that Aguilar would have a hard time with prolonged sitting, standing, walking, laying down, and climbing stairs, notwithstanding the lack of quantification on Nurse Zahn's part. The Commissioner points out that Aguilar's past relevant work did not involve climbing stairs, prolonged standing or walking, or laying down. *See* ECF No. 24 at 23. Fair enough. However, conspicuously absent from the Commissioner's argument is any mention of prolonged sitting, which surely was a significant component of both the accounting job and the payroll job. *See* R. 47–49 (Aguilar describing her duties at

16

those jobs), 69 (the vocational expert testifying that both jobs were performed at the sedentary level).

Second, the Commissioner notes that Aguilar "testified that she was able to change positions during her past work (Tr. 59) and the vocational expert testified that [Aguilar] could perform her past relevant work if she had to change positions every 30 minutes (Tr. 69–70)." ECF No. 24 at 23. But again, the ALJ thought that the evidence did not support *any* limitations in Aguilar's sitting ability. Thus, while it may be true that the result would be the same on remand if the ALJ simply adjusted his RFC to allow for changing positions every thirty minutes, such an approach does not appear to be supported by the record. If that is what the ALJ did on remand, he could be accused of impermissibly crafting an RFC to fit a "not disabled" outcome. (The ALJ is required to build a bridge between the evidence to his conclusion; he is not supposed start with his conclusion and then scour the record to find a path that leads him to his desired destination.) Moreover, it is unclear whether Nurse Zahn's opinion that Aguilar would have a hard time with prolonged sitting and standing is consistent with a limitation to sitting and standing for thirty minutes at a time.

The problem with the ALJ's failure to address Nurse Zahn's opinion is further illustrated by the fact that the ALJ provided questionable reasons for rejecting a similar opinion. Like Nurse Zahn, Nurse Bjork opined that Aguilar had limitations with prolonged sitting and standing. S*ee* R. 916. However, unlike the opinion of Nurse Zahn, the ALJ addressed Nurse Bjork's opinions, finding them unpersuasive because she did not include objective findings to support them and because they were inconsistent with the results of Aguilar's subsequent knee and back surgeries. R. 32. The Commissioner concedes that the first reason is flawed, *see* ECF No. 24 at 21; Nurse Bjork's opinion is accompanied by a

17

detailed physical exam, *see* R. 902–16. Nevertheless, the Commissioner maintains that any error in evaluating Nurse Bjork's opinions "is harmless because the rest of the ALJ's reasoning is sound." ECF No. 24 at 21. Again, I am not convinced. Aguilar agrees that the ALJ's point about her knee surgery was valid, *see* ECF No. 27 at 11—it did appear to greatly reduce her pain, *see* R. 677. But the ALJ's reliance on treatment notes immediately after Aguilar's back surgery was misplaced. Those records merely show that Aguilar was fit to be discharged; they do not say anything about the long-term effectiveness of the surgery. *See* R. 2095–2113. Thus, it was premature for the ALJ to cite that evidence as a basis for rejecting Nurse Bjork's opinion that Aguilar had difficulty with prolonged sitting.

In sum, the flawed reasons the ALJ provided for rejecting Nurse Bjork's opinion do not render harmless the ALJ's failure to address Nurse Zahn's opinion. Like Nurse Bjork, Nurse Zahn supported her opinion with a detailed physical exam. *See* R. 1967–76. Also, while Nurse Bjork evaluated Aguilar's back and knee impairments, Nurse Zahn focused solely on the back issue. The ALJ's reference to Aguilar's knee surgery therefore would be irrelevant in assessing Nurse Zahn's opinion. Finally, given the existing record, the ALJ had no evidentiary basis to conclude that Nurse Zahn's opinion about Aguilar's difficulty with prolonged sitting was inconsistent with the results of her back surgery.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ committed reversible error in not addressing the medical opinion of Nurse Zahn. Accordingly, the Commissioner's decision is **REVERSED**, and this action is **REMANDED** pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. On remand, the Commissioner should also address Aguilar's other claimed errors

relating to the medical opinion evidence, her mental impairments, and her subjective symptoms. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 13th day of July, 2021.

_____
STEPHEN C. DRIES
United States Magistrate Judge